Michelle **FISHER** and Matthew **Fisher**,

v.

**WALSH PARTS & SERVICE COMPANY, INC., American Gage and Machine Co., Walsh Press Company Inc., Katy Industries, Inc., Walsh Press & Die Company and WP Liquidating Corp.**

No. Civ.A. 01–CV–6604.

United States District Court, E.D. Pennsylvania.

Oct. 29, 2003.

552

Michael Fanning, Peter M. Patton, Sandra W. Morris, Galfand Berger, LLP, Philadelphia, PA, for Michelle L. Fisher, Matthew Fisher, Plaintiffs.

Eric M. Hurwitz, Stradley Ronon Stevens & Young LLP, Philadelphia, PA, Richard W. Foltz, Jr., Pepper Hamilton LLP, Philadelphia, PA, Bradley D. Remick, Marshall Dennehey, Warner Coleman & Goggin, Philadelphia, PA, for Walsh Parts and Service Company, Inc., American Gage & Machine Company, Katy Industries, Inc., Walsh Press Company, Inc., Walsh Press and Die Company, WP Liquidating, Corporation, Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SMITH, United States Magistrate Judge.

In this products liability action under § 402A of the Restatement (Second) of Torts, plaintiff Michelle Fisher and her husband Matthew Fisher bring suit against defendant Katy Industries, Inc. due to a devastating accident involving a press manufactured by defendant. Having considered the testimony of the parties' fact and expert witnesses, the Court finds no grounds upon which to impose liability on defendant.

## I. FINDINGS OF FACT

1. Plaintiffs, Michelle Fisher and Matthew Fisher, commenced this action on August 8, 2001, against Defendants Katy Industries and Walsh Parts & Services Company, Inc., American Gage and Machine Co., Walsh Press Company, Inc., Walsh Press and Die Company and WP Liquidating Corp. (collectively "Walsh") alleging that defendants are legally liable for damages under the Restatement (Second) of Torts § 402A.

2. Plaintiff Michelle Fisher seeks recovery for crush and amputation injuries to her left hand that she suffered while using defendants' product, a Walsh mechanical press Model No. 38MC, Serial No. 12153 ("Walsh press") during the course and in the scope of her employment.

3. Plaintiff Matthew Fisher, Michelle Fisher's husband, likewise seeks damages on a loss of consortium claim. At the time of trial, Matthew and Michelle Fisher had been married for 13 years and had an eleven-year old daughter.

4. The parties have filed a stipulation agreeing that Katy Industries, Inc. ("Katy") has assumed all liabilities for design, manufacture and sale of the subject Walsh press as if Katy Industries, Inc. had designed, manufactured and sold the subject Walsh press itself. Accordingly, the parties dismissed all named defendants.[1]

### A. Sale History of the Press

5. The subject Walsh press was based on a design by Walsh from the early 1900's.

6. It was originally sold by Walsh, on December 3, 1976, to Chambers, Bearing, Quinlan.

7. Approximately three years later, in 1979, Walsh sold parts to Chambers, Bearing, Quinlan for maintenance on the press.

8. From 1979–1987, no one knows what happened to the subject Walsh Press.

9. In 1987, International Peripheral Systems ("IPS") purchased the subject Walsh press from an unknown machinery dealer.

### B. Design of the Press

10. The subject Walsh press was a 38–ton open back inclinable press with a flywheel mechanism that drove the crankshaft.

11. Walsh designed the press to have a useful life of more than 100 years and to be used with a number of different dies. Defendant, through its representative and former chief engineer Jerome Heyda, admitted that Walsh could reasonably foresee (a) that there would be multiple owners and (b) that there would be some modifications to the press over time.

12. The Model 38 press was operated through two buttons on the top and outside of the machine. When the user hit the buttons, using both hands, the air cylinder was triggered and the latch rod was pulled down, allowing the spring-loaded clutch to engage into one of three latch points in the flywheel. The engagement of the clutch then caused the ram to descend and then ascend. It is also known as a full revolution type press, which means that the press will make one full stroke before stopping. A full stroke takes a total of 0.8 seconds.

13. The press could be operated in either continuous mode or single stroke mode.

---

**1.** As the parties, throughout the trial, referred to defendant as Walsh, the Court will, for clarity purposes, do the same in this opinion.

14. Walsh equipped the press with an "anti-repeat" or "non-repeat" device, which was designed to protect a worker when the press was in single stroke mode. In other words, when a worker hit the operating buttons, the press would only make one stroke. Defendant was aware, before 1976, that inadvertent repeats on a press would create the threat of multiple "pinch points," either between the dies or elsewhere on the press.

15. The anti-repeat device operated in two parts. The bell crank would strike the top and pull the clutch bolt upwards. Although the flywheel would continue to rotate, the clutch bolt would be disengaged from the flywheel by the latch bolt.

16. The safety assembly consisted of a latch bracket, held on to the cast iron frame of the press with two hex bolts. In turn, the hex bolts were secured by lock washers. As an additional means of fastening the assembly, the hex bolts were drilled crosswise across the hex head of the bolt so that safety wiring could be put through the bolts and twisted together.

17. The lock washers and the safety wire were precautionary measures to prevent the bolts from backing out of the frame. If the hex bolts loosened, such that the latch bracket backed off and was out of alignment, the press would go into a continuous cycle and would not stop until the power was pulled.

18. Jerome Heyda testified that he inspected every press that left Walsh. Based on that testimony, the Court concludes that the subject Walsh 38 press was equipped with both lock washers and safety wiring when sold to Chambers, Bearing, Quinlan. At the time the press arrived at IPS in 1987, there is no evidence as to whether the hex bolts were secured with either lock washers or safety wire.

C. *Warnings on Press and Safety Literature*

19. Every press manufactured by Walsh had two different warning plates—one on the slide of the press and one on the bolster of the press—which stated:

**DANGER**
**DO NOT ENTER DIE SPACE UNLESS SLIDE IS BLOCKED AND FLYWHEEL**
**IS AT REST**

IN THE EVENT OF A FAULTY OPERATION, DO NOT USE PRESS UNTIL IT IS FUNCTIONING PROPERLY. CARE SHOULD BE TAKEN THAT PRESS IS PROPERLY ADJUSTED AND MAINTAINED AT ALL TIMES.

20. The subject Walsh 38 press was also sold with a replacement parts list and parts drawing, but no owner's manual. All of this documentation was normally stored in a metal box on the control panel of the press.

21. The documents that originally came with the subject Walsh 38 press could not be found. IPS indicated that it never received these papers upon purchase of the press. Mr. Heyda, however, remarked that an owner need only request replacement papers from Walsh. Indeed, on numerous past occasions, Walsh has provided replacement documents to requesting customers.

22. Mr. Heyda further testified that the press was also sold with a flyer describing how to adjust the brake and when to oil the crankshaft and slide. A copy of this particular flyer could not be produced at trial, however, a comparable Walsh document was admitted into evidence as Defendant's Exhibit 37.

23. Nothing on the parts drawing or parts list indicated that the hex bolts were

to be safety wired. Nor did anything on those documents indicate that the owner should keep the safety mechanism in place. Part 37 on the parts drawing, however, gives a detailed drawing of the bracket assembly, which shows the bolts and the lock washers.

24. The press, as sold, did not have any warnings associated with it in regard to using non-factory obtained replacement parts. As reflected in Defendant's Exhibit number 37, which Mr. Heyda testified was similar to the literature provided with the press, there was, however, a notation that only "specially trained mechanics or die setters" should be permitted to inspect and adjust the non-repeat device.

### D. *Repairs and Alterations to Press*

25. While the press was owned by Chambers, Bearing, Quinlan, at least one repair was made to the machine. Chambers, Bearing Quinlan requested from Walsh two replacement clutch bolts to be placed on each side of the three holes in the flywheel.

26. Between the time the subject Walsh press was acquired by IPS in 1987 and the date of Mrs. Fisher's accident on September 20, 1999, IPS made three repairs to the press.

27. The first repair was to the latch rod, which IPS welded to the press. As a result of this repair, the latch rod, which had formerly been flexibly-mounted, became rigidly-mounted to the press.

28. The second repair occurred in mid–1998, when IPS replaced a broken latch rod. Defendant's expert, Peter Barroso testified that the break occurred because the latch rod had been rigidly mounted, placing undue stresses on it that were not there when the press was originally manufactured. In making this repair, IPS never called Walsh to request replacement parts. Rather, it fabricated a new rod and changed what was originally a one-piece

part into a two-piece part. When fastening it onto the press, IPS had to remove the whole latch bracket assembly, together with the lock washers and safety wiring. There was no testimony as to whether, when IPS put the latch bracket assembly back together, it included the lock washers and safety wiring.

29. John Briggs, the machine shop supervisor at IPS, testified that, when he started at IPS in June of 1999, the press was not working. Upon discovering that the air valve had deteriorated, Mr. Briggs made a third repair to the electropneumatic valve. In order to do so, he obtained a "rebuild kit" from a company by the name of Ross, who originally manufactured the valve. Briggs testified that the electropneumatic valve, located at the bottom of the press, is not close to the latch bracket, which is located at the top of the press.

30. At no point did IPS call Walsh for either replacement literature, replacement parts or servicemen.

31. Briggs testified that IPS had no preventative maintenance procedures when he first arrived at the company, meaning that it did no regular checking, lubing or greasing of the machines. The only maintenance was "breakdown maintenance," *i.e.* when the machine broke, it was fixed.

### E. *The Accident*

32. At the time of her injury, Michelle Fisher was employed by IPS, which manufactures mail canceling machines.

33. She originally began working at IPS in February of 1999 as an assembler. In July of 1999, however, she switched to the machine shop department at IPS, where the subject Walsh press was located.

34. IPS used the press in conjunction with a die designed and built by IPS to

form small metal parts. The selected die was secured into the press.

35. The press was set to operate in the single stroke or non-repeat mode.

36. On September 19, 1999, Mrs. Fisher worked on the subject Walsh press for the first time, for a period of five hours, without incident.

37. Charlie Ross showed Mrs. Fisher how to operate the press. She described the operation of the press as follows: the die was already set up in the press; she would put the piece of metal to be formed in the press and then hit the two green buttons on the outside of the machine and a little above her head; the press would come down and stamp the metal; and then she would take the piece out and put it in the done box.

38. On September 20, 1999, Mrs. Fisher used the press again and, at first, had no problems. During the course of the morning, however, she hit the buttons and the ram failed to descend. Consequently, she called Charlie Ross who assigned her to another machine until the subject Walsh press was repaired.

39. Later on that morning, she was reassigned to the subject Walsh press. At one point, she hit the two buttons, the ram came down and formed the metal piece and she reached in to remove the piece. While her hands were in the die space, the ram came down again and crushed her hand.

40. Mrs. Fisher testified that she understood that the only way to get the ram to come down was to hit the two buttons. She had never seen the press "repeat" prior to the accident. Accordingly, she was surprised when the press cycled again.

41. At trial, Mr. Fisher testified that she recalled seeing the warning on the press when using it, as it was at her eye level. She indicated, however, that she still thought it was safe to enter the die space after the ram came down and went back up, as long as she did not hit the two buttons. She further stated that she did not know that a "slide" was, as noted in the warning.

42. As a result of the accident, Mrs. Fisher suffered the loss of two fingers on her hand, multiple surgeries, pain, lost wages, mental anguish and loss of enjoyment of life.[2]

F. *Inspection of Press Post–Accident*

43. Immediately after the accident, John Briggs, together with Bob Shaffer, an engineer at IPS, inspected the press.

44. Briggs and Shaffer activated the press and it repeatedly worked without any problem. Upon continued operation, though, the press ultimately failed and continued to cycle, causing the ram to descend without activation.

45. Upon inspection, Briggs discovered that the two bolts holding down the safety mechanism on the press had come loose and one had actually backed out about one ten-thousandth of an inch so as to create a gap. This gap, he explained, caused the failure of the anti-repeat device.

46. Briggs noted, at that time, that the hex heads had holes drilled through them, indicating that safety wiring was supposed to be in place. He found no such wiring in place, though. He further testified that a toolmaker, machine builder, model maker or other qualified maintenance worker could look at those holes and know that they are for safety wiring. The press included no diagram on how the safety wiring should be done.

---

**2.** Although there was significant testimony and evidence submitted regarding the extent of plaintiffs' damages, we do not make any specific findings of fact on them in light of our ultimate verdict for the defendant.

47. Briggs also indicated that, during the course of his inspection, he saw only flat washers, not split lock washers, on the hex bolts.

48. Ultimately, after the accident, the press was disassembled and removed by Briggs and another IPS employee and sold to a junkyard on the order of IPS's owner.

### G. Feasibility of Alternative Designs

49. At trial, plaintiff presented expert witness Howard Sarrett, who testified as to the safety of the press as sold and the feasibility of alternative designs.

50. Howard Sarrett is a licensed professional engineer and has had training with industrial machinery. He has never, however, done any work with power presses and has never seen a functional Walsh 38 power press. Indeed, he incorrectly described the operation of the subject Walsh 38 power press by noting that the flywheel makes one full revolution with each operation of the clutch and then stops. In actuality, once the power is on, the flywheel continues to rotate and, when the operator hits the two buttons, the cylinder trips the press, the latch rod is pulled down, allowing the spring loaded clutch to engage the flywheel. After a full rotation, the clutch disengages, but the flywheel continues to spin. In light of both his lack of press experience and his misunderstanding as to its operation, the Court finds Mr. Sarrett to be a qualified expert, but accords less weight to his testimony.

51. Mr. Sarrett made multiple assertions about the press indicating that it was not safe as sold. First, he remarked that because the latch bracket was a bolted mechanism, it was reasonably foreseeable that it would be removed. He noted that anything that can be removed by design should be expected by the manufacturer to be removed. Otherwise, the manufacturer needs to make it permanent on the machine.

52. Mr. Sarrett further commented that the safety assembly would have to be removed if the press was ever relocated due to the fact that it protrudes from the press. As the press was designed to last over 100 years, it was reasonably foreseeable that the press would be resold or relocated.

53. Once Walsh chose to bolt the latch bracket on, it failed to assure a positive retention of the bolts, thus exposing a user to crush injuries upon failure of the anti-repeat device. More specifically, he indicated that the use of only lock washers and safety wiring was insufficient due to the likelihood that safety wiring would not survive over the life of the press.

54. Finally, Mr. Sarrett remarked that Walsh should have foreseen that the latch bracket assembly could be put back incorrectly without lock washers or safety wiring. The parts list for the press does not mention safety wiring or lock washers.

55. Mr. Sarrett then addressed design alternatives to maintain the integrity of the latch bracket. First, he suggested use of a stop pin running through the bolt to present it from backing away.

56. In addition, Mr. Sarrett proposed using a hex latch, which is a wrench type device that would essentially hug the bolt so it could not turn.

57. Finally, Mr. Sarrett noted that, due to the importance of the anti-repeat device, the press should have a failsafe mode, wherein if any part of the assembly breaks, the machine will automatically operate on a single stroke mode.

58. According to Mr. Sarrett, these suggested alternatives were feasible when the press was originally built.

59. In response to the testimony of Mr. Sarrett regarding design defects, defendant presented the testimony of Jerome Heyda, the former chief engineer at Walsh and the designer of the Walsh 90 ton press. In the Court's opinion as ultimate factfinder, Mr. Heyda convincingly and successfully rebutted Mr. Sarrett's expert opinion.

60. Mr. Heyda first addressed Mr. Sarrett's suggestion that the safety assembly be attached permanently to the press rather than bolted on and held with lock washers and safety wiring. He stated that the latch bracket could not be welded on since cast iron does not weld well. Moreover, to make it part of the casting and cast the latch bracket assembly onto the frame would require a 30 inch long drill, which is an infeasible approach.

61. Commenting on Mr. Sarrett's remark that removal of the latch bracket assembly was foreseeable, Mr. Heyda remarked that simple use of bolts did not make removal necessary or even probable. Moreover, he noted that mere movement of the press would not mandate removal of the assembly. Although the latch bracket sticks out, he explained that the flywheel protrudes from the press even further. As the flywheel does not need to be removed upon movement of the press, there should be no reason to remove the latch bracket assembly. The Court finds this explanation sufficient to counter Mr. Sarrett's testimony.

62. Mr. Heyda also disagreed with Mr. Sarrett's opinion that safety wiring could not be expected to last over the lifetime of the press. He stated that there should be no need to replace the safety wiring unless the latch bracket were taken off. Otherwise, the wiring should last over the entire useful life of the press. He explained that because the bolts are fitted horizontally into the machine, but the vibrations on the machine are vertical, the safety wiring suffers no great impact. Indeed, he indicated that other bolts in the press that are vertically-fitted and have neither lock washers nor safety wiring securing them are not loosened by the vibrations. As such, a horizontal bolt with both lock washers and safety wiring should likewise not come loose.

63. In addition, he commented that safety wiring served as merely an extra precaution since the bolts were already secured with lock washers that would not vibrate loose.

64. Mr. Heyda next turned to Mr. Sarrett's conclusion that the machine was defective because the parts list for the press does not mention safety wiring or lock washers. He rejected this opinion, indicating that the parts drawing shows a detailed drawing of the latch bracket assembly with both bolts and lock washers, thus putting a user on notice of their necessity. Further, he remarked that any qualified mechanic would know (a) that lock washers, instead of flat washers, should be used and (b) that the holes in the bolts were for safety wiring, as that was common in presses. The Court lends credence to these statements. Indeed, even Mr. Sarrett conceded that a wide variety of industries, including the automobile and aircraft industries, use safety wiring. Moreover, Mr. Briggs admitted that, based on his experience, he knew that the holes in the bolts were for safety wiring, and that any qualified toolmaker, model maker or machine builder should know the purpose of the holes.

65. In any event, Mr. Heyda testified that any repairs to the press should have been done by either Walsh personnel or other qualified maintenance people, who would know the proper repair techniques.

66. The Court accepts Mr. Heyda's testimony in full and finds (a) that the safety mechanism on the press, as designed and

documented, was not defective, and (b) that changes/repairs to the safety mechanism were not reasonably foreseeable to Walsh at the time of original sale.

67. The Court likewise finds, based on Mr. Heyda's testimony, that Mr. Sarrett's proposed alternative designs were not practicable. First, with respect to the roll pin, Mr. Heyda found it infeasible since it would require drilling a hole between the head and the hex, which was impossible to do without weakening the bolt. Additionally, the use of the roll pin would require removing the lock washers, as they are made from spring steel, which cannot be drilled. Consequently, while one safety device would be added, another would be discarded.

68. Mr. Heyda likewise rejected Mr. Sarrett's suggestion for using a hex latch or wrench. Because everyone tightens bolts a different way, the wrench and two bolts could almost never be lined up correctly and, thus, the wrench would never be tight enough.

69. Finally, Mr. Heyda commented that the machine already has a failsafe design. Specifically, if the brake fails, electrical circuitry exists to ensure that only one stroke occurs. Further, a key would be needed to change the press from single to repeat stroke mode.

70. Ultimately, Mr. Heyda concluded, and the Court agrees, that the press likely "repeated" unexpectedly because of the unforeseen modifications to it. Indeed, he noted that in other incidents where the Walsh 38 press had repeated unexpectedly, there had likewise been various unforeseen modifications.

71. By way of further rebuttal, defendant also offered Peter Barroso, Jr., a professional engineer with extensive experience in mechanical power press systems, to testify regarding the safety of the press. The Court finds his testimony quite convincing, with some minor exceptions.

72. Mr. Barroso, like Mr. Heyda, opined that the bolts holding the latch bracket assembly backed out due, not to the design of the press, but to unforeseeable modifications. Specifically, he noted that, as a result of IPS's series of repairs, the press's latch rod broke. When IPS made a new L-bracket and rod, it took off the whole latch bracket assembly, which, in turn, precipitated the loss of the lock washers and the safety wiring. Without the lock washers and safety wiring, the bolts backed out allowing the latch bracket to loosen and the press to go into repeat mode. According to Mr. Barroso, these were improper changes which should not have been anticipated by Walsh.[3]

73. Mr. Barroso reiterated Mr. Heyda's statement that the vibrations of the press would not have caused the bolts to come loose. If that were the case, all the bolts in our cars would come loose, as well as all the other bolts used in the press.

74. Ultimately, he reasoned that if, at the time of the accident, the non-repeat mechanism was on the press as sold, Michelle Fisher would not have suffered any injuries.

75. While the Court fully accepts Mr. Barroso's theory of the accident, we decline to find, as fact, that the lock washers or safety wiring were on the press at the time it was sold to IPS. The Court does conclude, however, that these items were missing from the press at the time of Mrs. Fisher's accident due to unforeseeable modifications to the machine.

3. Notably, Mr. Sarrett conceded that he did no research regarding whether the changes in the latch rod or the air cylinder by IPS would have caused additional stresses on the press which may have caused the accident.

### H. *Feasibility of Point of Operation Guards*

76. In an additional criticism of the Walsh press, Mr. Sarrett also testified that it could have been made safe if Walsh sold the press with point of operation guards. In particular, he commented on the "Udal" Guard used on presses in England. The Udal Guard is an open structure guard that can be adapted and used with great flexibility.

77. Mr. Sarrett remarked that had Walsh provided such a guard, it would have housed the die space and closed when the fly wheel was engaged, so that the operator could not reach the die space.

78. Although he acknowledged that a single guard may not cover 100% of the applications, he stated that guards are adaptable.

79. Mr. Heyda, however, again disagreed. He indicated that the power press is multi-functional and can be used with different dies and different tools. Moreover, it can be purchased for different types of jobs and can have multiple methods for putting material in and taking material out of the press. Because an operator would need a guard for each different function, the owner of the press stands in the best position to provide an appropriate guard.

80. With respect to the proposed Udal guard, Mr. Heyda noted that it was designed specifically for British presses and never sold in the United States. British presses are almost all hand operated, not automated with multiple die operations.

81. Mr. Barroso also disagreed with Mr. Sarrett. He opined that the press did not need to be sold with point of operation guards. Rather, the employer must determine how the press will be used and then tailor the guards for their particular use. Indeed, he indicated that OSHA regulations place the responsibility for point of operation guards for a power press on the employer-owner.

82. The Court accepts the testimony of Mr. Heyda and Mr. Barroso that Walsh had no responsibility to provide point of operation guards.

### I. *Feasibility of Warnings*

83. Finally, Mr. Sarrett criticized the warnings on the subject Walsh press. He indicated that the warnings were ineffective since they were (a) very general, (b) failed to define the hazard and the nature of the action to be taken and (c) presumed sophistication on the part of the operator.

84. Warnings, he stated, are an important part of the design of a product and serve as the last, best opportunity to protect a user. The Walsh 38 press, with its current warnings, was not, in his opinion, safe.

85. Mr. Sarrett commented that, due to the importance of the anti-repeat device, the press should have had a warning indicating that if the latch bracket assembly came loose, the machine would be dangerous. Further, it should instruct that the latch bracket assembly should be checked during every use.

86. As an exemplar of an appropriate warning, Mr. Sarrett suggested the following:

### DANGER

Anti-repeat device is a critical safety feature of this press.

Always check operation of anti-repeat device before operating press.

Always check bolts/nuts of anti-repeat device to ensure bolts/nuts are tight, and secured with safety wires before operating press.

Always check to ensure that anti-repeat device is clear of any boxes or other

materials that could hinder safe operation, before operating press.

Always consult Walsh press 1–800–xxx–xxxx before making any alterations to this anti-repeat device.

Always ensure that only specially trained mechanics inspect, adjust or repair this press.

Do not remove or cover this sign.

Mr. Sarrett conceded, however, that even his warning was defective in several respects, particularly its lack of specificity.

87. Again, defendant successfully rebutted this testimony. Mr. Heyda first addressed Mr. Sarrett's statement that because the latch bracket assembly was only bolted, rather than welded on, the press should contain a warning saying to never remove it. He noted that the motor, brake, ball socket and control panel are all crucial items to the press, but are likewise bolted. To follow Mr. Sarrett's logic, then, would require that the press be plastered with warnings regarding each of these items. Accordingly, the Court does not find that such a warning was necessary.

88. Moreover, the Court takes heed of Mr. Barroso's reasonable opinion that had the warning on the press as sold been followed, there would have been no injury. Although Michelle Fisher testified that she saw the warning, she did not follow its directives. Indeed, she indicated that she did not even fully understand it.

## II. CONCLUSIONS OF LAW

1. As the Court is acting under diversity jurisdiction, Pennsylvania law governs this dispute. *Pavlik v. Lane Ltd. Tobacco Exporters Int'l*, 135 F.3d 876, 881 (3d Cir. 1998).

2. The Pennsylvania Supreme Court has adopted Section 402A of the Restatement (Second) of Torts, which imposes strict liability for defective product designs. *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853, 854 (1966). This section states as follows:

(1) One who sells any product in any defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused by the ultimate user or consumer, or to his property, if:

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

RESTATEMENT (SECOND) OF TORTS § 402A.

3. Interpreting this provision, the Pennsylvania Supreme Court has indicated that, "Section 402A ... requires only proof that a product was sold in a defective condition unreasonably dangerous to the user or consumer, and that the defect was the proximate cause of plaintiff's injuries." *Walton v. Avco Corp.*, 530 Pa. 568, 610 A.2d 454, 458 (1992). Thus, to recover under § 402A, a plaintiff must establish: "(1) that the product was defective; (2) that the defect was a proximate cause of the plaintiff's injuries; and (3) that the defect causing the injury existed at the time the product left the seller's hands." *Pavlik*, 135 F.3d at 881.

4. The theory underlying products liability law is allocation of loss. "Plaintiffs, inevitably, will be injured by products. The party in the better position to absorb that loss is the manufacturer or seller.

That loss is a cost of doing business." *Davis v. Berwind Corp.*, 433 Pa.Super. 342, 640 A.2d 1289, 1295 (1994), *aff'd*, 547 Pa. 260, 690 A.2d 186 (1997). Notwithstanding this theory, section 402A does not impose absolute liability. "A manufacturer is a guarantor of its product, not an insurer." *Id.*

5. To ensure that the public policy behind strict liability is met, Pennsylvania law focuses on the concept of foreseeability. In other words, the plaintiff in a products liability action must show that a product is "unreasonably dangerous to intended users for its intended use." *Parks v. Alliedsignal*, 113 F.3d 1327, 1331 (3d Cir.1997) (quoting *Walton*, 610 A.2d at 454). Defining the phrase "intended use", the Third Circuit has held that, "the intended use of a product 'includes all those [uses] which are reasonably foreseeable to the seller.'" *Pacheco v. Coats Co., Inc.*, 26 F.3d 418, 422, *reh'g denied*, (3d Cir.1994) (quoting *Sheldon v. West Bend Equip. Corp.*, 718 F.2d 603, 608 (3d Cir.1983)).

6. Plaintiffs contend that the Walsh 38 power press was unreasonably dangerous because (1) the safety devices were inadequate as designed, and any changes to them were reasonably foreseeable; (2) no point of operation guards were provided; and (3) it lacked sufficient and properly designed warnings. The Court now addresses each of these points in turn.

A. *Substantial Modification*

■ 7. Consistent with the overriding concept of foreseeability in strict liability cases, a material change in the product severs the chain of causation where the plaintiff would not have been injured had the product remained in its unaltered state. *Davis*, 640 A.2d at 1296. In other words, a seller is not liable if a safe product is made unsafe by subsequent changes. *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893, 898 (1975). Thus, a manufacturer may be relieved of liability if, "(1) the product was substantially altered after it left the manufacturer's control; (2) the modifications were not foreseeable to the manufacturer; and (3) the changes to the product were a superseding cause of the user's injury." *Hoffman v. Niagra Machine and Tool Works Co.*, 683 F.Supp. 489, 493 (E.D.Pa.1988).

■ 8. The question of whether a post-delivery modification constitutes a substantial change constitutes an issue to be decided by a factfinder. *Merriweather v. E.W. Bliss Co.*, 636 F.2d 42, 44 (3d Cir. 1980).

■ 9. Notably, an alteration that can be reasonably anticipated is still a "substantial change" within the meaning of § 402A if it is negligently or improperly implemented. *Kuisis v. Baldwin–Lima–Hamilton Corp.*, 457 Pa. 321, 319 A.2d 914, 922 n. 15 (1974).

10. "Where the product has reached the user or consumer with substantial change, the question then becomes whether the manufacturer could have reasonably expected or foreseen such an alteration of its product." *Davis*, 640 A.2d at 1297. The theory reasons that, "[i]f the manufacturer is to effectively act as the guarantor of his product's safety, then he should be held responsible for all dangers which result from foreseeable modifications of that product." *Eck v. Powermatic Houdaille, Div. of Houdaille*, 364 Pa.Super. 178, 527 A.2d 1012, 1019 (1987).

■ 11. Foreseeability is again a question for the factfinder unless the inferences are so clear that a court can say as a matter of law that a reasonable manufacturer could not have foreseen the change. *D'Antona v. Hampton Grinding Wheel Co.*, 225 Pa.Super. 120, 310 A.2d 307, 310 (1973).

■ 12. If a substantial alteration, not foreseeable to the manufacturer, occurs and that alteration amounts to a supervening or intervening cause of the plaintiff's injuries, the manufacturer or seller is not liable for injuries caused by its defective product. *Davis,* 640 A.2d at 1297.

■ 13. In the case at bar, the Court concludes that the mechanical design of the Walsh 38 press was safe with the inclusion of the anti-repeat device.

14. The anti-repeat device was securely fastened to the press through the use of two hex bolts screwed into the cast iron frame of the press. The hex bolts were then fastened with lock washers and safety wiring, both of which are sufficient precautionary measures to prevent the bolts from backing out of the frame.

15. The Court accepts the testimony of Jerome Heyda and Peter Barroso that the latch bracket needed to be bolted onto to the frame of the press as opposed to being welded. Further, the Court finds that the use of the lock washers and safety wiring were acceptable techniques to secure the bolts, and that the alternative designs suggested by Howard Sarrett were both infeasible and impractical on this type of machine.

16. Had the latch bracket assembly been secured with both the lock washers and the safety wiring, at the time it was used by Michelle Fisher, the Court concludes that the accident resulting in the loss of her fingers would not have occurred.

17. Unfortunately for Mrs. Fisher, however, and by no fault of her own, the press was altered, over the course of its history, in such a fashion that the latch bracket assembly was no longer safely fastened to the press. During the post-accident inspection, the hex bolts, which hold the latch bracket assembly, had backed out, resulting from the absence of both lock washers and safety wiring securing

them. Based on the testimony of Mr. Barroso, the Court finds that the backing out of the hex bolts was the cause of the accident.

■ 18. The absence of the lock washers and safety wiring at the time of Mrs. Fisher's accident was, as a matter of law, a substantial change in the design of the press. As originally sold, the press was equipped with both lock washers and safety wiring on the latch bracket assembly. While the Court recognizes that these items may not have been on the press at the time that IPS purchased the machine, our uncertainty as to this fact is of no moment. If the lock washers and safety wiring were missing at the time that IPS purchased the machine, then the substantial modification occurred at the hands of an unknown owner during the period of time when the whereabouts of the press were unknown. If the items were present upon IPS's acquisition of the press, then the Court concludes that it was very likely the result of the repairs performed by IPS. As Mr. Barroso testified, the latch rod broke after being rigidly mounted to the press, when it had previously been flexibly mounted. When IPS redesigned the L-bracket and rod, it took off the whole latch bracket assembly. There is no indication that this assembly was then properly re-secured using the lock washers and safety wiring. Such a faulty repair constituted a substantial change.

19. Pursuant to the prevailing jurisprudence, the Court must now consider whether the removal of the latch bracket assembly was foreseeable to Walsh at the time the press was sold. As a primary matter, the Court credits Mr. Heyda's testimony that it was not a foreseeable occurrence, over that of Mr. Sarrett. While Mr. Sarrett testified that if the press was ever relocated, the safety assembly would have to be removed, Mr. Heyda successfully

rebutted that opinion and explained that, even when moving the press, no reason exists to remove the latch bracket.

20. In addition, the Court finds that repairs to the assembly, requiring its removal, were not foreseeable. As convincingly explained by both Mr. Heyda and Mr. Barroso, the safety device was designed, as was the press, to last for over 100 years. The vertical vibrations of the press should not affect the position of the bolts, which are affixed horizontally. The repairs that IPS was required to make to the latch rod occurred as a result of its previous incorrect modifications. No evidence otherwise exists that removal of the latch bracket assembly was foreseeable to Walsh.

21. Even assuming *arguendo* that repairs to the latch bracket assembly were foreseeable, the Court does not find that Walsh should have anticipated that they would have been done incorrectly. While no evidence was presented indicating that the press was equipped with either the lock washers or the safety wiring at the time the press was sold to IPS, we find that the design of the press and its accompanying literature sufficiently informed a buyer that both lock washers and safety wiring were required. The parts drawing showed a detailed drawing of the bracket assembly, indicating both the hex bolts and the lock washers. While that literature could not be found and was not received by IPS when it bought the press in 1987, Mr. Heyda testified that an owner simply needs to call Walsh for replacement literature. IPS failed to do so.

22. Furthermore, although neither the parts drawing nor the parts list suggested that safety wiring should be used, the holes in the hex bolts were sufficient, as per the testimony of John Briggs, to put

any qualified toolmaker, machine builder, model maker or other maintenance worker on notice that safety wiring was needed.

23. Finally, had IPS used knowledgeable maintenance people, as was reasonable, the repairs would have been performed properly. As noted above, the literature that originally accompanied the press stated that repairs should be done by "specially trained mechanics." Further, John Briggs testified that even if such a notice was not on the press, it was logical to contact Walsh for replacement parts.[4] Rather than calling Walsh for either parts or repair persons, however, IPS elected to perform all of the repairs itself, even though it lacked the capability to do them correctly.

24. Ultimately, Mr. Sarrett conceded that a repair to the latch bracket wherein the hex bolts were not tightened, the lock washers not put back and the safety wiring not done, would constitute an improper repair.

25. In light of the foregoing, this Court concludes that the subject Walsh 38 press was substantially altered subsequent to leaving Walsh and that the modifications were not reasonably foreseeable to Walsh. Moreover, we find that those modifications were a superseding cause of plaintiff's injuries, thereby alleviating Walsh's liability under a design defect theory.

### B. *Point of Operation Guards*

26. In a second effort to impose liability on defendant, plaintiffs argue that even if an alternative, safer design was not feasible, defendant had an obligation to provide point of operation guards for the press.

---

4. Mr. Sarrett opined that the press was defective, in part, because it did not have Walsh's telephone number on it. He conceded, how- ever, that Walsh was listed in the Thomas Register, which is a list of manufacturers' phone numbers.

■ 27. The Court rejects this theory of liability on two grounds. First, crediting the testimony of Mr. Heyda and Mr. Barroso, we find that, due to the multifunctional nature of the Walsh 38 press, it would be impossible for defendant to provide a point of operation guard that would safeguard a user for every possible use of the press. The Udal Guard mentioned by Mr. Sarrett was designed for use with hand-operated, non-multi-use British presses. No evidence exists that the use of such a guard during Michelle Fisher's operation of the press would have prevented the accident.

28. Second, regulations from OSHA state that "[t]he employer *shall* provide and ensure the use of 'point of operation guards' or properly applied and adjusted point of operation devices for every operation performed on a power operated press." (emphasis added). As such regulations clearly place the responsibility on the employer to provide these guards, the Court cannot hold defendant strictly liability for failing to provide them.[5]

## C. *Failure to Warn*

29. Plaintiffs' final theory of liability alleges that the press was defective due to inadequate/insufficient warnings on the press.

30. Under strict liability theory, a "defective condition" is not limited to defects in design or manufacture. The seller may have to provide warnings to make it safe for use. *Walton v. Avco Corp.*, 530 Pa. 568, 610 A.2d 454, 458 (1992). In failure to warn cases, then, recovery is sought on the theory that the product is "unreasonably dangerous" when "unaccompanied by a warning with respect to nonobvious dangers inherent in the use of the product." *Ellis v. Chicago Bridge and Iron Co.*, 376

Pa.Super. 220, 545 A.2d 906, 908 (1988), *appeal denied*, 524 Pa. 620, 571 A.2d 383 (1989). "Where warnings or instructions are required to make a product non-defective, it is the duty of the manufacturer to provide such warnings in a form that will reach that ultimate consumer and inform of the risks and inherent limits of the product." *Walton*, 610 A.2d at 459 (citing *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893, 902–903 (1975)).

■ 31. To establish liability on a failure to warn theory, a plaintiff must also establish that it was the total lack or insufficiency of a warning that was both a cause-in-fact and the proximate cause of the injuries. *Pavlik v. Lane Ltd. Tobacco Exporters*, 135 F.3d 876, 881 (3d Cir.1998).

■ 32. "Where a warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition ..." RESTATEMENT (SECOND) OF TORTS, § 402A, comment j. Warnings which are ignored, whether by buyer or user, are not inadequate simply because it is possible that one chooses to ignore them. *Davis v. Berwind Corp.*, 433 Pa.Super. 342, 640 A.2d 1289, 1300 (1994), *aff'd*, 547 Pa. 260, 690 A.2d 186 (1997). Rather, the causation analysis focuses on the additional precautions that *might* have been taken by the end user had the allegedly defective warning been different. *Pavlik*, 135 F.3d at 882 (quoting *Remy v. Michael D's Carpet Outlets*, 391 Pa.Super. 436, 571 A.2d 446, 449–450 (1990)).

33. Ultimately, such a determination requires a weighing of possibilities by the factfinder. *Id.*

---

5. Notably, evidence of industry standards has been deemed admissible in a strict liability case to show the responsibility of the employer, not the manufacturer, to provide point of operation guards. *See Christner v. E.W. Bliss Co.*, 524 F.Supp. 1122, 1125 (M.D.Pa.1981).

34. Plaintiffs, in the case at bar, assert that, as sold, the subject Walsh press had warnings that were inadequate to alert a user, such as Mrs. Fisher, to the risk of injury of a press repeat. To support their theory, they offer three arguments. First, they contend, as testified to by Mr. Sarrett, that the warnings on the press were insufficient as they did not inform the user of the dangers of the machine. Second, they contend that the press should have had a warning indicating that the anti-repeat device was a critical safety feature which should be checked prior to each use. Third, they assert that the press should have stated that no repairs should be made to the anti-repeat device without first calling Walsh and then using a qualified mechanic.

35. The Court, however, finds that plaintiff have not established their failure to warn claim. First, with respect to the warnings on the machine, the Court concludes, as a matter of law, that because the press was otherwise safe in its design, a user was put on sufficient notice regarding the dangers of the press.

36. Metal warnings on the slide of the press stated, "DO NOT ENTER DIE SPACE UNLESS SLIDE IS BLOCKED AND FLYWHEEL IS AT REST." Mrs. Fisher testified that she saw this warning, but still believed it was safe to enter the die space after the ram came down and went back up, as long as she did not hit the two operating buttons again. She likewise testified that she did not know what a slide was.

37. The Court finds that the warning was sufficient to warn Mrs. Fisher of any dangers that were reasonably foreseeable by Walsh. As testified to by Mr. Barroso, had Mrs. Fisher been properly trained to understand the warning and had she heeded that warning, the injury would not have occurred.

38. Turning to plaintiffs' second argument, that the press should have had a warning indicating that the anti-repeat device was a critical safety feature which should be checked prior to each use, we likewise find no merit. Primarily, we note that the press was equipped with a warning stating that, "IN THE EVENT OF A FAULTY OPERATION, DO NOT USE PRESS UNTIL IT IS FUNCTIONING PROPERLY. CARE SHOULD BE TAKEN THAT PRESS IS PROPERLY ADJUSTED AND MAINTAINED AT ALL TIMES." While perhaps overly general in precisely what care needed to be taken, the warning alerted IPS that some preventative maintenance needed to be taken.

39. The Court finds that IPS failed to heed this warning. Mrs. Fisher testified that the press was not working earlier on the day of her accident in that the ram failed to descend when she hit the activating buttons. Although her supervisor moved her to a new machine temporarily while the press was made operational again, he returned her to the subject Walsh press a short while later without unequivocally assuring its correct functioning.

40. Moreover, the Court finds that IPS would not have heeded any more specific warning, as suggested by Mr. Sarrett, to check the operation of anti-repeat device before every use of the press. John Briggs, of IPS, testified that IPS had no preventative maintenance procedures in June of 1999, meaning that they did no regular checking, lubing or greasing of the machines. He referred to IPS's maintenance procedures as "breakdown maintenance," indicating that only when a machine broke did IPS service it.

41. Finally, a warning stating that the latch bracket assembly should be checked prior to every use, while feasible, was not necessary at the time of sale. As the

Court has repeatedly found, had substantial modification of the press not occurred, the lock washers and safety wiring would have been in place, and the hex bolts would not have backed out. This safety assembly was designed to last for the life of the press and should not have required any maintenance. Had this designed been maintained, the suggested warning would have had no purpose.

42. Plaintiffs' third argument also fails to establish grounds for strict liability. They contend that the press should have contained some type of warning that no repairs should be made to the press or latch bracket assembly without first calling either Walsh parts or a qualified mechanic. As testified to by Mr. Heyda, however, the literature provided with the press stated that an owner should use specially trained mechanics. IPS never made any attempt to call Walsh to obtain replacement literature.

43. Moreover, Mr. Briggs noted that when he needed replacement parts or repair advice for other machines or parts, he knew to call the manufacturer. Notwithstanding that knowledge, IPS chose to make repairs to the Walsh press itself, without contacting either Walsh or another mechanic qualified to work on Walsh presses.

44. Consequently, this Court finds, as a matter of law, that the absence of a warning on the press itself, stating that only Walsh personnel or other qualified mechanics should work on the press was not a proximate cause of plaintiffs' injuries.

45. Ultimately, the Court does not find any insufficiency of warnings which was both the cause in fact and the proximate cause of plaintiffs' injuries.

## III. CONCLUSION

In light of the foregoing, the Court must render a verdict in favor of the defendant. While we recognize the hardship suffered by Michelle Fisher as a result of this horrific accident, we cannot lay blame on the shoulders of the defendant manufacturer. Defendant designed and produced a reasonably safe machine. At various points throughout its existence, however, the press was modified in an unforeseeable fashion that rendered it unsafe. Walsh could neither have prevented these modifications nor warned against them. Although the Court regrets not being able to alleviate some of plaintiffs' financial hardship, both law and equity mandate that Walsh not be held responsible for such changes. Accordingly, we order that judgment be entered in favor of defendant.

An appropriate Order follows.

## ORDER

AND NOW, this 29th day of *October*, 2003, upon conclusion of a bench trial, upon review of the evidence submitted and upon consideration of the Proposed Findings of Fact and Conclusions of Law filed by both parties, it is hereby ORDERED that JUDGMENT IS ENTERED in favor of defendant Katy Industries, Inc. and against plaintiffs Michelle Fisher and Matthew Fisher.

It is so ORDERED.